RECEIVED
USDC, WESTERN DISTRICT OF LA.
TONY R. MOORE, CLERK
DATE  7/28/15
BY     DM

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| BRIAN C. TURNER, SR. | CIVIL ACTION NO: 14-02812 |
| VERSUS | JUDGE DONALD E. WALTER |
| OCEANEERING INTERNATIONAL, INC. | MAGISTRATE JUDGE HANNA |

## MEMORANDUM RULING

Before the Court is a Motion for Summary Judgment [Doc. #9] filed by the Defendant, Oceaneering International, Inc. ("OII"), in which OII contends that Plaintiff's employment discrimination claims, pursuant to 42 U.S.C. § 1981, are time-barred and subject to dismissal. Plaintiff, Brian C. Turner, Sr. ("Turner") filed an untimely opposition.[1] [Doc. #14]. OII replied. [Doc. #17]. For the reasons assigned herein, OII's motion is **GRANTED**.

## BACKGROUND[2]

This case arises out of a complaint filed by Turner on September 26, 2014. Turner, an African-American male, alleges that he was subjected to racial discrimination and race-based harassment, in violation of 42 U.S.C. §1981, while employed by OII. Turner was hired by OII as a dispatcher on or about June 17, 1999, and he remained in the Dispatch Department from 1999 until he was transferred to the Logistics Department in June of 2009. Turner then worked in the Logistics Department until he was transferred to the Inventory Department on August 13, 2010.

---

[1] The Court granted Turner's motion for leave to file an out of time opposition [Docs. ## 12, 13] and has considered the arguments set forth therein. The Court also acknowledges the inconsistencies in the exhibit identifiers. [*See* Doc. #17, p. 1, FN1]. For that reason, within this ruling, the Court refers to all submissions by their CM/ECF identifiers, in both document and page number.

[2] These facts were drawn from OII's statement of uncontested material facts [Doc. #9-3], Turner's response thereto [Doc. #12-4], and the source documents referenced therein.

Not long thereafter, Turner resigned from OII in September of 2010. Turner claims that his resignation amounted to a "constructive discharge."

While in the Dispatch Department, one of Turner's caucasian co-workers was Roe Childress. Sometime in late 1999, while in Turner's presence but not directed toward Turner personally, Childress referred to African-Americans as "lazy dumb monkeys" that "always had their hands out wanting a free ride." Thereafter, Turner complained about Childress's comments, and on May 23, 2000, a meeting was held wherein Turner's complaints about Childress were discussed. Present at the meeting were Turner, his supervisor Duane Landry, and Human Resources Department representatives Dave McNamara and Deborah Stevenson. Turner has no knowledge regarding whether or not Childress was reprimanded as a result of his complaints. Turner cannot recall any other specific incidents of racial discrimination or racial harassment directed toward him during the years 1999 and 2000.

From 2000 through 2007, Turner claims that he was subject to a "plethora" of discriminatory events or actions at OII. Turner claims that he "was called up to [his] supervisor's office much more frequently and consistently than [his] colleagues were."[3] Turner further states that, from 2000 to 2004, he had to meet with his supervisor Duane Landry on a daily basis, due to complaints made by one of Turner's then-colleagues, Midge Bourgeois. In January of 2006, a co-worker told Turner that Bourgeois had circulated a "racially charged" letter from someone calling himself "W.C. AKA-The Vanilla Gorilla."[4] The letter was unrelated to Turner or his work and appears to be an open letter to then Mayor of New Orleans C. Ray Nagin, responding

---

[3] Doc. #9-4, pp. 14-15.

[4] Doc. #9-9, p. 2.

to certain comments made by Nagin, regarding New Orleans being a "chocolate city."[5] Bourgeois apparently attached a copy of this letter and a cartoon map to an email, which she then circulated to various OII employees. Turner did not receive the email directly from Bourgeois.

Bourgeois was eventually promoted and became Turner's supervisor in July of 2008. Aside from a general accusation that Bourgeois "harassed [him] all the time," Turner cannot recall a time when Bourgeois used racial slurs toward him.[6] Likewise, Turner cannot recall any specific incidents of racial discrimination or racial harassment directed towards him during 2008.[7] On March 4, 2009, Bourgeois issued a written warning to Turner for leaving his dispatcher post to investigate oil that had leaked from a truck in the facility parking lot. Turner disagreed with the merits of the write-up, believing it to be a form of racial discrimination, because a white dispatcher who left his post to take smoke breaks was not disciplined. However, Turner has no personal knowledge as to whether his white comparator ever went 250 feet away from his post, as Bourgeois believed that Turner had done and for which Turner was issued the warning. Aside from that incident, Turner cannot recall any other specific incidents of racial discrimination or harassment directed towards him during the remainder of his time in the Dispatch Department, which culminated on June 1, 2009.[8]

Turner was transferred from dispatcher to a logistics coordinator position, effective June

---

[5] *Id.* at p. 3.

[6] Doc. #12-5, p. 12, lines 6 and 18-25; Doc. #9-4, p. 18, lines 1-4.

[7] Doc. #9-4, pp. 19-20.

[8] Turner "contests" this statement; however, the only evidence he offers in support thereof is a reference to a complaint that Turner lodged with Bourgeois against a co-worker named Naomi Brazel. Brazel was a night dispatcher, whom Turner reported to Bourgeois for using foul language toward Turner. Turner has not provided the Court with any information purporting to show that this incident involved race or racial discrimination or harassment. [*See* Doc. #12-5, pp. 15-16].

1, 2009. Turner's direct supervisor in the Logistics Department was William Dupree. During his time in Logistics, Turner believes that his caucasian co-workers Sammi Wilkes and Gary Plaisance avoided him, and refused to help him understand the processes and procedures of Logistics. One of those co-workers, Wilkes, played rap music in the office and would allegedly raise the volume when the word "nigger" was used in the lyrics. Finding this offensive, Turner made several complaints to his supervisors, and Wilkes stopped playing the offensive music. On one occasion, another co-worker, Plaisance, displayed a poster in the office, which depicted an African-American looter with the caption "why work when I could take it for free?" Turner complained to his supervisor, Dupree, but the poster was not removed. On June 18, 2010, Plaisance hung a toy doll from the office ceiling, using a rope that had been tied into a noose configuration. The doll had light brown skin, "kinky" hair and belonged to Dupree's daughter. Turner complained to Dupree about this incident that same day, June 18, 2010.

On August 13, 2010, Turner was told that he was being transferred out of Logistics and into a warehouse position. Although Turner was told that the transfer was due to lack of work, he believes that the transfer was actually retaliation for his complaint to Dupree about the incident with the doll. Turner viewed the transfer as a demotion and described it as a "crushing blow" that made him feel "worthless." Turner was so "humiliated" and "dishonored" by the change of position that he cried when told about the transfer. Although Turner's pay rate remained the same, $16.50 per hour,[9] Turner considered the transfer to the warehouse to be a "mockery" and testified that "it was the worst insult that could happen to a person." Turner was so upset by the transfer that he took a week off before beginning work in the warehouse. In his new warehouse

---

[9] It is undisputed that Turner's rate of pay was the same, but Turner contends that he was not offered overtime in the warehouse position.

position, Turner was required to wear steel-toed boots and use a forklift to remove bulky items from high shelves. Turner complained and, in response, was given forklift operator training, after which he achieved a score of 100% on his post-training certification test. From his first day in the warehouse, Turner was required to perform menial tasks, described by Turner as "gopher's work," such as emptying trash cans, mopping and sweeping.

Turner's direct supervisor in the warehouse was Byron Dugas, to whom Turner ultimately tendered his two weeks' notice of resignation. Although Turner cannot recall the exact date on which he gave said notice, Dugas testified that Turner tendered his notice on Friday, September 17, 2010, to be effective two weeks later, on September 30, 2010.[10] On Monday, September 27, 2010, OII's Human Resources Compliance Supervisor, Deborah Stevenson contacted Turner by telephone, because Turner had not worked since September 17, 2010.[11] During the call, Turner agreed to accelerate the effective date of his termination to that day, September 27, 2010, which was then reflected in Turner's OII Employee Termination Report as the "termination effective date."[12] It is undisputed that Turner was at work when he tendered his resignation to Dugas, and Turner does not recall having any additional conversations with Dugas regarding his resignation. OII's Report Time Sheets for the weeks of September 13–19, and September 20–26, 2010, confirm that Friday, September 17, 2010 was the last day that Turner

---

[10] Doc. #9-11. Turner further stated that, within a month after his arrival at the warehouse, he approached Byron Dugas and told him that he would be leaving OII. [*See* Doc. #12-5, p. 32, lines 18-20].

[11] During his deposition, it appears that both counsel for OII and Turner himself agreed that Stevenson's phone call occurred on Thursday, September 23, 2010; however, Stevenson's affidavit, Turner's Termination Report, and all arguments set forth since then, suggest that the phone call occurred on Monday, September 27, 2010. [*See* Doc. #12-5, p. 37 (Turner depo); and Doc. #9-12, p. 2, ¶¶ 7-8 (Stevenson's affidavit), and p. 6 (Termination Report)].

[12] Doc. #9-12, p. 6. Turner indicates that this statement of fact is "contested" and cites his deposition at Doc. #12-5, pp. 31-32 and 37-38; however, Turner's testimony confirms that Turner agreed to accelerate his termination.

physically worked at OII. The last entry on Turner's time record reflects that he was paid for a sick day on Monday, September 20, 2010.[13] Turner does not dispute the accuracy of OII's time records and has no evidence that he worked any days after September 17, 2010.[14] Instead, Turner points to his "Internet Application for UI Benefits," submitted on October 1, 2010, which declares September 27, 2010 to be the date on which Turner last worked.[15]

Turner testified that he was compelled to resign from the warehouse position because he was experiencing severe pain in his feet from wearing steel-toed boots everyday; he was uncomfortable with the safety risks involved in having to remove heavy or bulky items from the top shelf using a forklift; and he was angry and humiliated by having been transferred to the warehouse to begin with.[16] On September 1, 2011, Turner filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), asserting claims of race discrimination and retaliation. Specifically, Turner complained that "from June 7, 2009 until [his] constructive discharge on September 27, 2010, [he] was subjected to harassment, humiliation, intimidation, racial harassment, and a hostile work environment."[17] The EEOC issued a Dismissal and Notice of Rights on January 24, 2013, and the instant suit was

---

[13] Doc. #9-4, pp. 63-65; Doc. #9-12, p. 2.

[14] Again, Turner indicates that this statement of fact is "contested" and cites his deposition at Doc. #12-5, p. 35. However, a review of Turner's deposition confirms that Turner simply could not recall the last date that he actually worked in OII's warehouse and that Turner repeatedly confirmed that he had no reason to doubt OII's payroll records, reflecting September 17, 2010 as the last date that Turner was physically at work. [See Doc. #12-5, p. 35; and Doc. #9-4, pp. 65-67].

[15] Doc. #12-7.

[16] Doc. #9-4, p. 61.

[17] Doc. #9-7.

commenced on September 26, 2014.[18]

The instant motion for summary judgment is limited to OII's argument that Turner's claims are time-barred. In his response, Turner argues that his constructive discharge claim is not time-barred and that his claims for hostile work environment and demotion are admissible as "other acts evidence," in support of the constructive discharge claim.

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) directs that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[19] A fact is "material" if it may affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is sufficient evidence so that a reasonable jury could return a verdict for either party. *Id.* The court must "review the facts drawing all inferences most favorable to the party opposing the motion." *Reid v. State Farm Mutual Auto Insurance Co.*, 784 F.2d 577, 578 (5th Cir. 1986).

The moving party bears the initial responsibility of informing the court of the basis for its motion, and identifying those parts of the record that it believes demonstrate the absence of a genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986);

---

[18] The parties appear to agree that the EEOC issued its dismissal and notice of rights on January 24, 2013; however, the Court has no evidence of that document or the date upon which it was issued. OII submits that the EEOC found "no cause to credit [Turner's] allegations[,]" a fact which is contested by Turner without elaboration. [*See* Doc. #9-3, p. 6, ¶40; and Doc. #12-4, p. 3, ¶40]. Because section 1981 does not require exhaustion of administrative remedies, as does Title VII, this is not a relevant fact. *See Jones v. Robinson Property Group, L.P.*, 427 F.3d 987, 992 (5th Cir. 2005).

[19] Rule 56 was amended effective December 1, 2010. Per the comments, the 2010 amendment was intended "to improve the procedures for presenting and deciding summary-judgment motions and to make the procedures more consistent with those already used in many courts. The standard for granting summary judgment remains unchanged." Therefore, the case law applicable to Rule 56 prior to its amendment remains authoritative, and this court will rely on it accordingly.

*Lawrence v. Univ. of Tex. Med. Branch at Galveston*, 163 F.3d 309 (5th Cir. 1999). The moving party need not produce evidence to negate the elements of the non-moving party's case, but need only point out the absence of evidence supporting the non-moving party's case. *Celotex Corp.*, 477 U.S. at 325; *Lawrence*, 163 F.3d at 311. Once the moving party carries its initial burden, the burden then falls upon the non-moving party to demonstrate the existence of a genuine dispute as to a material fact. *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). This burden is not satisfied with some metaphysical doubt as to the material facts, by conclusory or unsubstantiated allegations, or by a mere scintilla of evidence. *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). The non-moving party "must go beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial." *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) (citations omitted).

## LAW AND ANALYSIS

Section 1981 prohibits employment discrimination on the basis of race. *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975). Specifically, the statute provides that "[a]ll persons within the jurisdiction of the United States shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Like many federal statutes, 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991, does not contain a statute of limitations. *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 371 (2004). Traditionally, when faced with such federal statutes, courts apply "the most appropriate or analogous state statute of limitations." *Id.* Under Louisiana law, "[a] section 1981 claim is best characterized as a tort ... and is, therefore, governed by the one-year prescriptive period for delictual actions dictated by [Louisiana Civil Code article] 3492." *Taylor v. Bunge Corp.*, 775

F.2d 617, 618 (5th Cir. 1985). However, for actions arising under federal statutes enacted after December 1, 1990, courts must apply a catchall four-year statute of limitations. *See* 28 U.S.C. § 1658(a) ("Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues."). In *Jones*, the Supreme Court held that the federal four-year statute of limitations is applicable to claims made possible by the 1991 revisions to section 1981. 541 U.S. at 383.

"The 1991 revisions allow a plaintiff to sue for conduct, such as harassment or termination, that occurs after contract formation." *Johnson v. Crown Enterprises, Inc.*, 398 F.3d 339, 341 (5th Cir. 2005). As Turner has alleged that he was subjected to racial discrimination that ultimately resulted in his resignation or "constructive discharge" from OII, his claims were made possible by the 1991 revisions to section 1981. Therefore, Turner's claims are subject to the federal four-year statute of limitations, rather than Louisiana's one-year prescriptive period for delictual actions. The relevant inquiry for the Court is on what date Turner's employment discrimination claims accrued. OII argues that Turner's suit is time-barred, because it was not filed within four years of either of the following dates: August 13, 2010, the date that Turner was transferred to the warehouse position; or September 17, 2010, which represents both the last day worked by Turner and the date on which Turner gave his two weeks notice.[20] Turner responds that the controlling date should be the effective date of his resignation, September 27, 2010.

Evaluating the parties' conflicting arguments requires a brief analysis of the nature of the

---

[20] As an initial matter, the Court agrees with OII that there is no genuine dispute regarding the date of Turner's last day of work. It was September 17, 2010. Turner's own statement on his UI benefits application cannot be offered for the truth thereof, particularly when that statement is contradicted by both OII's employment payroll records and Turner's own deposition testimony confirming the accuracy of those payroll records.

claim. "A constructive discharge occurs when the employer makes working conditions so intolerable that a reasonable employee would feel compelled to resign." *Hunt v. Rapides Healthcare System, LLC*, 277 F.3d 757, 771 (5th Cir. 2001).Courts consider the following factors when determining whether an employee has been constructively discharged: "(1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (6) offers of early retirement that would make the employee worse off whether the offer was accepted or not." *Id.* at 771–72 ("The question is not whether [the employee] felt compelled to resign, but whether a reasonable employee in [his] situation would have felt so compelled."). Although the substantive legal standard is that of a reasonable employee, the Court will review the facts drawing all inferences in favor of Turner in considering the instant motion for summary judgment.

The essence of Turner's constructive discharge claim is that he was ultimately forced to resign as a result of being subjected to years of racial discrimination and race-based harassment throughout his employment with OII. Turner has alleged that the discrimination and harassment began as early as 1999, when he was first hired by OII. Although Turner claims that the discriminatory behavior was pervasive, none of the alleged incidents were directed toward Turner personally until 2009. During 2009, Turner contends that he was discriminated against via a disciplinary write-up and that, upon being transferred to logistics, his caucasian co-workers avoided him, refused to help him transition into the new position, and played racially offensive rap music in the office. On June 18, 2010, Turner alleges that two white co-workers pretended to lynch an African-American baby doll from the office ceiling, after which Turner immediately complained to his supervisor. Two months later, on August 13, 2010, Turner was transferred to

the warehouse position, which Turner believed to have been retaliation for his complaint regarding the June 18 incident with the doll. Despite experiencing no change in his rate of pay, Turner immediately viewed the transfer as a demotion and described it as a "crushing blow" that made him feel "worthless," "humiliated," and "dishonored" to the point of tears.

On Friday, September 17, 2010, Turner tendered his notice of resignation to his direct supervisor, Byron Dugas, and Turner did not physically return to work a single day thereafter. After a phone call with OII's Human Resources Compliance Supervisor, Deborah Stevenson, Turner agreed that his resignation would be effective September 27, 2010. In considering the above-listed factors that would later guide this Court's substantive legal analysis, the transfer that Turner considered a "demotion" that resulted in a "reduction in job responsibilities" and a "reassignment to menial or degrading work," occurred on August 13, 2010. *See Hunt, supra,* 277 F.3d at 771-72. And, the various allegations of "badgering, harassment, or humiliation," which Turner argues were calculated to encourage his resignation, occurred prior to and until his last day of work, September 17, 2010. *See id.* Similarly, all other alleged discrimination and race-based harassment, of which Turner complains, occurred on or before September 17, 2010, the date on which Turner decided to tender his resignation. Even Turner states that he felt compelled to resign "[i]n light of the previous discrimination and recent transfer[.]"[21] Thus, Turner was aware of the alleged discriminatory act, and the facts which might support the instant cause of action, on or before September 17, 2010. *See Pruet Production Co. v. Ayles,* 784 F.2d 1275, 1279 (5th Cir. 1986) (explaining, in context of equitable tolling, that "[t]he statute does not begin to run until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights." (quoting *Reeb v. Economic*

---

[21] Doc. #14, p. 3.

*Opportunity Atlanta, Inc.*, 516 F.2d 924, 930 (5th Cir. 1975)).

As the Fifth Circuit stated in *Hunt*, "[a] constructive discharge occurs when the employer makes working conditions so intolerable that a reasonable employee would feel compelled to resign." 277 F.3d at 771. If indeed a constructive discharge *occurs* in any given case, the same date would mark the accrual of a cause of action therefor. The instant lawsuit was not filed until September 26, 2014. As such, the Court finds that Turner failed to commence this action within the requisite four years of the date upon which Turner's claim accrued, which was no later than September 17, 2010. *See Christopher v. Mobil Oil Corp.*, 950 F.2d 1209, 1213-15 (5th Cir. 1992) (ADEA statute of limitations commenced running as soon as all material elements of ADEA theory became evident); *Benkert v. Texas Dept. Criminal Justice*, No. 02-20437, 2002 WL 31049461, at *1 (5th Cir. Sept. 3, 2002) (per curiam) (claim of constructive discharge accrued when employee left the employer on leave and did not return, not when he formally resigned); *Ajayi v. Walgreen Co.*, 562 F. App'x 243, 246 (5th Cir. 2014) (per curiam) (at the latest, constructive discharge occurred on the date employee chose to resign); and *Chardon v. Fernandez*, 454 U.S. 6 (1981) (applicable limitations period began to run when notice of termination was given rather than date when employment terminated).

## CONCLUSION

Accordingly, for the foregoing reasons, the Motion for Summary Judgment [Doc. #9] is hereby **GRANTED**. Plaintiff's claims are time-barred and are hereby **DISMISSED WITH PREJUDICE**. Each party shall bear their own costs.

**THUS DONE AND SIGNED** in Shreveport, Louisiana, this 28th day of July, 2015.

DONALD E. WALTER
UNITED STATES DISTRICT JUDGE